# FLORA *v.* POWRIE.

PATENTS; INTERFERENCE; EFFECT OF PATENT OFFICE DECISIONS ON APPEAL;
PROCESSES; MICROSCOPIC EXAMINATIONS.

1. As the Commissioner of Patents will not reverse the board of examin-
ers-in-chief after that board has affirmed the preliminary examiner or
examiner of interferences on mere question of fact, unless the decision
be clearly against the weight of the evidence, so this court, when the
commissioner concurs in and affirms a decision of the board on mat-
ters of fact, will not reverse the decision of the Commissioner on any
mere question of doubt whether it be correct or not.   Where matters
of law are involved, a different principle applies.

2. In an interference proceeding, the case of the senior party stands on his
record or filing dates until overcome by testimony produced on the
part of the junior party on whom the burden of proof rests.

3. In an interference case involving an invention of a method or process
for making photographic multi-colored screens for use in so-called col-
ored photography, where the junior party claimed conception, dis-
closure, and reduction to practice all on a given date, and consisting
of the making of certain screens by the process described in the issue,
the testimony was examined and reviewed and *held* insufficient to over-
come the prima facie case of the senior party, nothing appearing on
the face of the screens themselves to show that they were made by such
process, while a microscopic examination in the Patent Office seemed
to negative the fact that they were so made; the president of the
photograph company, to whom the junior party claimed in his pre-
liminary statement he delivered a complete written description of the
invention, not having been called as a witness, although living and
competent to testify, and who therefore should have been called by
such party as a witness; and it further appearing that such junior
party failed to produce the alleged paper containing such description,

although he did produce three different papers, one of which did contain the description in question, but which was written at some time not fixed by the evidence.

4. The results of the use of the microscope (which is an optical scientifical instrument by which objects are so magnified that details invisible or indistinct to the naked eye are clearly seen) are admissible in evidence and are presumed to be correct until shown to the contrary, upon the same principle that the results of the working of many other scientifical instruments are presumed to be correct; and the examiners in the Patent Office, who are selected and appointed with respect of their skill and scientific knowledge, will be presumed by this court to have the requisite skill and knowledge to understand the use of, and the manner of using, the microscope in their work. It is their duty to make all proper tests and experiments to establish the truth between the parties, and as between the parties and the public.

5. In an interference case involving a process or method of making photographic multi-colored screens or plates for use in so-called colored photography, it is competent for the examiner of interferences to make and report the result of a microscopic examination of screens or plates produced by one of the parties and claimed by him to have been made by the process described in the issue; and his report will be received and considered by this court. If either of the parties was dissatisfied with the result of such an examination, he might have had the matter subjected to further tests either before the examiners-in-chief or the Commissioner on appeal.

No. 241. Patent Appeals. Submitted November 18, 1903. Decided February 2, 1904.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.         *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Douglas Dyrenforth* and *Mr. W. W. Dudley* for the appellant.

*Mr. Louis K. Gillson* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This appeal is from the Patent Office in a matter of interfer-

ence, and the subject-matter of the issue is as to the method or process of making photographic multi-colored screens for use in what is called colored photography; the object being the production of a picture of the object photographed in all its natural colors. The interference is declared as between the application of Ellsworth E. Flora, filed January 13, 1902, and the application of John H. Powrie, filed October 25, 1901. It thus appears that Powrie is the senior party of record, and that the onus of proof to show priority of invention is upon Flora, the junior party of record. The issue of interference is stated in fifteen paragraphs or sections, and is as follows:

"1. The herein-described method of producing heliochromic effects, consisting in successively exposing different portions of a sensitized surface to actinic rays, and developing and dyeing the exposed portions.

"2. The herein-described method of producing heliochromic effects, consisting in successively exposing different portions of a sensitized surface to actinic rays, and developing and dyeing the exposed portions; the surface being resensitized intermediate of the exposures.

"3. The herein-described method of making heliochromic screens, consisting in successively photographing and dyeing juxtaposed bands in a common plane on a sensitized plate.

"4. The method of producing a photographic color-screen, which consists in subjecting the suitably sensitized coating of a transparent medium to the action of light through a transparency provided with opaque lines, figures, or dots to render parts of said coating insoluble and others soluble, and then coloring the insoluble parts and setting the color.

"5. The method of producing a photographic color-screen, which consists in subjecting the suitably sensitized coating of a transparent medium to the action of light through a transparency provided with opaque lines, figures, or dots to render parts of said coating insoluble and others soluble, then coloring the insoluble parts by absorption therein of the coloring material and then setting the color.

"6. The method of producing a photographic color-screen,

which consists in subjecting the suitably sensitized coating of a transparent medium to the action of light through a transparency provided with opaque lines, figures, or dots to render parts of said coating insoluble and others soluble, then cleaning the medium of the soluble sensitized material, then coloring the remaining insoluble material and setting the color.

"7. The method of producing a photographic color-screen, which consists in rendering insoluble, in lines, figures, or dots, the sensitized material on a transparent medium by subjection to light, and then coloring said lines, figures, or dots and setting the color.

"8. The method of producing a photographic color-screen, which consists in subjecting the suitably sensitized surface coating of a transparent medium at different parts by successive operations to the action of light, and after each said operation coloring and mordanting the newly remaining insoluble portions of the coloring.

"9. The method of producing a photographic color-screen, which consists in subjecting the suitably sensitized surface coating of a transparent medium at certain parts to the action of light, then cleaning the medium of the remaining soluble material and coloring and mordanting the insoluble parts, again coating the transparent medium between said insoluble colored parts with suitably sensitized material, subjecting parts of the newly sensitized surface to the action of light, coloring, and mordanting, repeating said operations for each color desired.

"10. The method of producing a photographic color-screen, which consists in subjecting the suitably sensitized surface coating of a transparent medium at certain parts to the action of light, then cleaning the medium of the remaining soluble parts, then applying one coloring-matter to the insoluble parts and mordanting the same, again coating said transparent medium between said insoluble colored parts with suitable sensitized material, subjecting parts of the newly sensitized surface to the action of light, then cleaning the medium of the remaining soluble material, then applying another and different coloring-matter to be absorbed by the then new insoluble surface and

mordanting the same, again coating said transparent medium between said colored parts with suitable sensitized material, and then when the same is rendered insoluble applying thereto a still different coloring-matter to be absorbed by the new insoluble surface and mordanting the same.

"11. The method of producing a photographic color-screen, which consists in subjecting the suitably sensitized surface coating of a transparent medium to light through a plate of transparent material, provided with opaque lines, dots, or figures, the relative positions of the plate and said medium being changed with each operation, and intermediate of said operations coloring and mordanting.

"12. The method of producing a photographic color-screen, which consists in subjecting the suitably sensitized surface coating of a transparent medium at certain parts to the action of light, then cleaning the medium of the remaining soluble sensitized parts, then applying one coloring-matter to the insoluble parts and mordanting the same, again coating said transparent medium between said insoluble colored parts with sensitized material, subjecting parts of the newly sensitized surface to the action of light, then cleaning the medium of the remaining soluble sensitized material, then applying another and different coloring-matter to be absorbed by the new insoluble surface and mordanting the same, again coating the transparent medium between the then colored parts with sensitized material to produce a third new insoluble surface and applying thereto a still different coloring-matter to be absorbed by the then new insoluble surface and mordanting the same, and finally coating the colored surface with transparent protecting material.

"13. The method of producing a photographic color-screen, which consists in providing a transparent plate having opaque lines, figures, or dots thereon, separated by clear spaces, the opaque and clear portions of the plate being so arranged that one occupies twice the area of the other, subjecting the suitably sensitized surface coating of a transparent medium to the action of light through said plate, cleaning said medium of the remaining soluble material and coloring and mordanting the

then remaining insoluble material, again coating the transparent medium between said colored parts with sensitized material and repeating said operations by printing through the said plate in a different position and then coloring, employing a different color in each coloring operation.

"14. The method of producing a photographic color-screen, which consists in subjecting the suitably sensitized surface coating of a transparent medium at parallel parts by successive operations to the action of light through a line, opaque screen, and after each said operation coloring and mordanting the insoluble portions of the coating.

"15. The method of producing a lined photographic color-screen, which consists in providing a transparent plate having parallel opaque lines with spaces between them one half the width of the lines, subjecting the suitably sensitized surface coating of a transparent medium to the action of light through said plate, coloring and mordanting the then insoluble material, again coating the transparent medium between said colored parts with sensitized material, subjecting it to light through the opaque-lined plate in another position and coloring, and mordanting the then new insoluble material, and repeating said operations by printing through the opaque-lined plate in different positions, and then coloring, until the surface of the transparent medium is completed, employing a different color in each coloring operation."

According to the preliminary statement of Flora, his conception, disclosure, and reduction to practice of the invention, all occurred on or about May 1, 1897. There was no drawing or model made. But he alleges that he first embodied the invention in a full-sized photographic screen, which was completed about the 1st of May, 1897, and that such screen was first successfully operated in Chicago in the spring and summer of the year 1897. That in the spring or summer of that year he made a number of photographic multicolored screens by the method set forth in the declaration of interference. That on or about the 22d day of January, 1900, he wrote a description of the method of making multicolored screens, in accordance with

the invention set forth in the declaration of interference, which description, with a description of other proposed improvements, was on or about the 17th day of March, 1900, given by the appellant to the president of the International Color Photo Company, of which appellant was superintendent, to be delivered to the board of directors of that company; a copy of which description has been preserved by appellant.

Powrie, the senior party, in his preliminary statement, alleges that his conception and disclosure of the invention occurred on the 6th day of October, 1899; no model or drawing was made, but that completion and use of a screen were effected by August 12, 1900; and that reduction to practice was effected November 29, 1900.

A large volume of evidence was taken by the parties, and it would appear that the case was the subject of a very elaborate and critical examination before the tribunals of the Patent Office,—all of whom concurred in one conclusion. The case is essentially one of fact, and the facts of the case have been most fully reviewed by all the tribunals before whom it has been heard, and they all concur in the conclusion, and for very much the same reasons, that Powrie is entitled to priority of invention. The onus of proof being upon Flora, as the junior party of record, the examiner of interferences, the board of examiners-in-chief, and the Commissioner, all in succession, concur in holding that Flora had failed to establish priority, and that priority of invention should be awarded to Powrie on his record title to priority, as the senior party of record.

We have examined with care the voluminous record before us, and also the opinions of the tribunals of the Patent Office, and we are far from being satisfied that there is error in the conclusion reached by the tribunals below. The rule is an established one, and prevails in the Patent Office as well as in other courts, and that is, where the board of examiners-in-chief affirms the decision of the preliminary examiner, or the examiner of interferences, the Commissioner of Patents will not reverse the board on any mere question of fact, unless the decision be clearly against the weight of evidence. *Hazelip* v. *Richardson,* 10

O. G. 747, 1876; Walker, Patents, § 132. And so on appeals to this court, the rule is established that where the Commissioner concurs in and affirms the decision of the examiners-in-chief on matters of fact, this court will not reverse that decision, unless it clearly appears that the decision was against the weight of evidence. It will not be reversed on any mere question of doubt whether it be correct or not. Therefore, where the court can see that the facts of the case have been fully and carefully examined by the tribunals of the Patent Office, resulting in a concurrence of decision thereon, it is deemed entirely unnecessary to restate and reiterate the facts gone over by the tribunals below, with a repetition of their conclusions, unless it clearly appears that a different result should have been reached in the court below. Of course, where matters of law are involved a different principle applies.

The onus being upon Flora, his case must be first examined, as the case of Powrie stands good on his record dates, until overcome by testimony produced on the part of Flora.

Flora claims to have conceived the invention and reduced the same to practice on the 1st day of May, 1897. In support of this allegation he has produced certain screens which he claims to have made by the process described in the issue. But there is really no certain reliable corroborative evidence to show how these screens were made, and the evidence would seem to refute the testimony of Flora, the claimant. McDonough, in whose laboratory the screens are said to have been made, is dead, and the only witnesses called to testify as to these screens are Banning and Sheridan; but neither of these witnesses pretends to know how the screens were made. There is nothing on the face of the screens themselves to show how they were made, or that they were made by the process described in the issue of interference. They have been subjected to a microscopic test or examination and that would seem to negative the fact as alleged by Flora, or at least to throw doubt upon the pretense that the screens were made by the process described in the issue.

In his preliminary statement, as we have seen, Flora alleges that he reduced to writing a complete description of his inven-

tion and which was by him delivered to the president of the International Color Photo Company; and the testimony shows that the president of that company was D. K. Tripp. This president of that company would therefore appear to have been an important witness for Flora, and he is living, and competent as a witness. But he was not called as a witness and did not testify. In case of doubt in regard to the paper delivered to him, and as to the disposition thereof, his testimony would seem to be most essential. And as Flora alleged the making of the paper, and the delivery of it to Tripp, and he relies upon it to establish a material fact in his case, it was incumbent upon him not only to prove the writing of the paper, but the time and circumstances of the making thereof, and if lost or destroyed, to prove the contents by competent means.

Instead of producing the best evidence of the paper, and when it was written, Flora offered in evidence three papers or documents, differing in appearance, but similar in language. These documents are marked, "Flora Proposed Improvements," "Copy Flora Proposed Improvements," and "Tripp's Copy Flora Proposed Improvements." Each of these three papers or documents is in reality made up of three independent papers. But neither of them is identified as the original paper written by Flora himself and delivered to Tripp. As stated by the Commissioner, the first part, composed of pages marked 1 to 8, inclusive, consists of a series of suggestions by Flora of "Proposed Improvements in Different Departments of the Laboratory." The second paper is composed of pages marked 1 and 2, and is headed "The Optical Lantern or Stereopticon." The third paper is composed of pages marked 1, 2, and 3, and is headed "Method of Making Ruled or Stippled Screens by Photography." This last paper contains a description of the invention of the issue. At the end of the first paper, marked Exhibit Flora Proposed Improvements, Flora's signature appears, but neither of the other two parts appears to have been signed by Flora. The party for whom the original paper is alleged to have been made and to whom it was delivered was not called as a witness to testify; nor are the papers produced identified

with what is alleged to have been the original paper delivered to
Tripp.    Flora himself testified, it is true, that the document
exhibited is one of the originals, there having been three copies
made, but this is not substantiated by the other witnesses.    We
gather from the testimony of Mrs. Bessey, the typewriter, and a
witness for Flora, what these papers produced in evidence are,
and how they came into existence.

Referring to exhibit "Flora Proposed Improvements," under
the division or head "Method of Making Ruled or Stippled
Screens by Photography," she is asked:

Do you remember writing that?   .

*Ans.* Yes; I remember.

*Ques. 26.* Do you, in a general way, remember what follows
that heading?

*Ans.* A description of the process.

*Ques. 27.* Please look over carefully the matter following
the heading, and state if you now remember writing that at the
time you mention in 1900, as you stated it in the latter part of
March or the first part of April.

*Ans.* Yes; I remember writing this subject-matter at that
time.

*Ques. 19.* Did you make either of these copies which are
before you, and referred to in your last answer?

*Ans.* I think not.

*Ques. 20.* What do you think these copies are?

*Ans.* I think they are reproductions of my copy.

She further testified, on cross-examination, as to what she
understood of the copy that she made of the original paper,
and in answer to cross-question 62, she said:

"There are several things about the paper that impressed
themselves upon my mind at the time I wrote it.    One was the
evolution of the work.    The word 'stippled' was a new one to
me, a line that was one three-hundreths of an inch seemed very
small, and there were several things in the description that
reminded me of the spectrum which I studied at that time.

I couldn't give a description of the process. I don't understand it now. I was taking quantities of work at the time, and of course I didn't stop to understand everything I wrote. The work was all familiar to me as I looked it over."

The other witnesses upon the subject of definite disclosure of the process of the invention of the issue are not more clear and definite in their recollection than Mrs. Bessey. Indeed, the only satisfactory description of the process is that contained in the last three pages of the third paper or copy of the proposed improvements, under the head "Method of Making Ruled or Stippled Screens by Photography." But it is impossible to determine from the evidence in the record before us, when those last three pages were written, or when they were added to the preceding parts of the document.

Douglass, one of the witnesses examined and re-examined by both parties, and whose testimony is somewhat conflicting, states that he prepared part of the original report on the proposed improvements in 1900 or early in 1901, and that he has no recollection of having seen at that time that part of the copy of the paper which contains the description of the process in issue in this interference. And Banning, the patent attorney connected with the International Color Photo Company as director and attorney, and appearing as a witness for Flora, in answer to cross-question 59, which inquired of him:

"As a director or as counsel, did you advise the patenting of this invention in the name of Flora?"

He replied:

"No; for as I have already stated, I never saw the account of the invention contained in the exhibits that have been shown me until the latter part of December, 1901, and, as I have already stated, I did not, at the time Mr. Flora showed me his screens, and plates, and pictures, in 1897, understand the details of the process by which they were made. The machinery that Mr. Tripp had built and on which he had Mr. Flora working was for ruling straight lines on the glass plates or screens. As counsel I prepared applications as instructed by Mr. Tripp."

Mr. Sheridan, another witness for Flora, testified substan-

tially to the same effect. In answer to question 33, which inquired of him whether Flora had ever described to him the method he employed in producing the screens shown him in 1897, said:

"He did not in detail. He merely told me it was produced by photography, as far as I can remember; and he showed me a screen which he said had been produced by photography."

If the paper alleged to have been prepared by Flora and delivered to Tripp, in March, 1900, to be considered by the board of directors of the International Color Photo Company,. including Mr. Banning, who was the counsel of the company, did in fact contain the description of the process of producing the screens described in the issue, it is somewhat difficult. to conceive how it is that Mr. Banning knows nothing of it; or how it happened that the description of the process was not placed in the hands of the attorney for examination, and, if favorably considered, that an application was not prepared for the Patent Office. But no explanation of these matters is. shown; and the application finally made to the Patent Office was not filed until more than three months after the application by Powrie was filed. These facts are not without significance, and they are not clearly explained as they should be. Tripp,. possibly, if he had been examined as a witness might have given an explanation, but he was not called as a witness in the case..

When the case was before the examiner of interferences for investigation, as to the rights of the parties to priority of invention, he, in the exercise of his right and duty as examiner (the nature of the subject-matter manifestly required it) resorted to the use of the microscope as a means for the examination of the screens exhibited by Flora, to ascertain whether they were made by the process as defined in the issue of interference. The result of this examination was quite at variance with the process. described by Flora and as defined in the issue.

The result of the examination by the microscope is stated by the examiner in his opinion, and he states it thus:

"The examiner has made a careful microscopical examination of each of the several exhibits referred to, and finds not only

that the colors are in many instances superposed, but that in each exhibit, without exception, there is a thick stratum of uncolored transparent gelatin, the depth of which is markedly out of all proportion to that of the colored part. By scratching the gelatin its uncolored base is clearly seen, and an examination of a section of the film of Flora stippled screen "BaC," Flora mica screen, and plate No. 23, of the screens in evidence as Flora Exhibit, 'Later Stippled Screen D,' both when attached to the carrying-plate and when separated therefrom, reveals this characteristic, and shows that the dye has not penetrated the gelatin to any appreciable extent, but is merely superficial. The demonstration to this effect, found in the brief on behalf of Powrie, is confirmed in every instance. It is inconceivable that these plates could have been made by the method alleged and yet reveal the peculiarities so antagonistic to the theory of their production. The examiner is impressed with the conviction that they were not made by the process in question. These characteristics exhibited are more nearly in accord with what would appear to be the natural result, had they been made by the process described in McDonough's patent, No. 471,186, March 22, 1892, in evidence as Powrie's Exhibit McDonough Patent."

This is the result of the microscopic examination by the examiner of interferences; and the Commissioner, in his opinion, says that a mere inspection of these plates with the aid of the microscope is sufficient to raise a grave doubt as to the fact that the plates referred to were made by the process of the issue.

The examination of the exhibits of Flora by the aid of the microscope, bringing the tribunals of the Patent Office to the conclusion that there was grave doubt as to whether the exhibits were made by the process described in the issue of interference, was sufficient of itself to turn the scale against Flora; for the onus of proof being upon him, any rational doubt as to the existence of rightful claim to priority on his part, at once determines the matter against him, unless that doubt be overcome by clear and decisive proof.

But objection is raised on the part of Flora to the use of the

microscope in the examination of the screens and plates ex-
hibited in the case.    It is urged in argument that such an exam-
ination was not legally admissible by the examiner of interfer-
ences, and that the result of his examination by such means
could not have credence allowed it by either the examiners-in-
chief or the Commissioner of Patents, or this court on appeal.
But we are not of that opinion.

The microscope is an optical scientifical instrument by which
objects are so magnified that details invisible or indistinct to
the naked eye are clearly seen.    It has in modern times become
one of the most important instruments for the cultivation and
development of many departments of science; and every depart-
ment of science in which it can be employed has the instrument
so constructed as to be suitably adapted to the work in which it
is used.    It may be true, as contended, that every person has
not sufficient skill in its use to employ it with perfect accuracy.
But the examiners in the Patent Office are selected and ap-
pointed in respect to their skill and qualifications to make exam-
inations and comparisons of claims to inventions, and of the
priority of such claims, and this necessarily involves skill and
knowledge of no small degree.    We must suppose, therefore,
such examiners to have the requisite skill and knowledge to
understand the use, and the manner of using, so important an
instrument in their work as the microscope.    The Patent Office
is provided with the most approved scientific instruments with
which to test matters involved in claims to inventions relating
to science and the useful arts; and it is the duty of the exam-
iners to make all proper tests and experiments to establish the
truth as between the parties, and as between the parties and the
public.    U. S. Rev. Stat. § 4890 (U. S. Comp. Stat. 1901,
p. 3383).    The results of the use of the microscope are admis-
sible as evidence, and are presumed to be correct until shown
to the contrary, upon the same principle that the results of the
working of many other scientifical instruments are presumed
to be correct.    In stating this principle, Taylor, in his work on
Evidence (vol. 1, p. 135, § 148), says:

"For example, a jury would be advised, in the absence of evi-

dence to the contrary, to rely on the general correctness of a watch or clock, which had been consulted for the purpose of fixing the time when a certain event happened.    So, a thermometer would be regarded as a sufficiently safe indication of the heat of any liquid in which it had been immersed, and a pedometer might be used as evidence of the distance between two places which had been traversed by the wearer.    Blood stains are every day detected by means of known chemical tests. So, aneroids, anemometers, and a variety of other ingenious contrivances for detecting different matters will occasionally play an important part as furnishing presumptive proof in courts of justice."

Upon the principle upon which this microscopical examination is sought to be excluded in this case, a magnifying-glass could not be applied by court or jury to detect the different colors of ink in which a paper may be written or signed, or to detect a forgery; and if an instrument cannot be read because of defective eyesight, or because of bad writing, a judge would not be allowed to aid himself in deciphering the instrument by the use of spectacles.    It is not pretended here that everything on the screens or plates is discernible to the naked eye; they were therefore proper subject-matters for the use of the microscope, as without the use of that instrument the screens could not be read.    If either of the parties was discontented with the result of the microscopical examination that was made, he could have had the matter subjected to further tests either before the examiners-in-chief or the Commissioner, on appeal.    But that was not attempted.

Our conclusion is, with the several tribunals of the Patent Office, that Powrie is entitled to stand upon his record date of the 25th day of October, 1901, to establish constructive reduction to practice; that Flora, being the junior party with the onus of proof upon him, has failed to overcome the prima facie case in favor of Powrie, and that the latter is entitled to priority of invention as against Flora; and therefore priority must be awarded to Powrie, and the decision of the Commissioner be

affirmed.   It is therefore directed that the proceedings and this decision be certified to the Commissioner of Patents to be entered of record in the Patent Office, in accordance with law.

*Decision affirmed.*